1
2
3
4
5
6
7
8
9
10
11
12

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL INSURANCE COMPANY,<br><br>                                      Plaintiff,<br><br>v.<br><br>TUNGSTEN HEAVY POWDER &<br>PARTS, INC., et al.,<br><br>                                      Defendants.<br>_____<br>And Related Cross Action. | Case No.:  21-CV-1197 W (MDD)<br><br>**ORDER (1) GRANTING MOTIONS TO SEAL [DOCS. 40, 44, 58, 66, 73]; (2) GRANTING IN PART & DENYING IN PART FEDERAL'S MOTION FOR SUMMARY JUDGMENT [DOC. 47] AND (3) GRANTING IN PART & DENYING IN PART TUNGSTEN'S MOTION FOR PARTIAL SUMMARY-JUDGMENT [DOC. 39]** |

        This is an insurance-coverage dispute between Plaintiff and Cross-Defendant Federal Insurance Company and its insureds, Defendants and Cross-claimants Tungsten Heavy Powder & Parts, Inc. ("THP") and Tungsten Parts Wyoming Inc. ("TPW").  The case arises from an industrial furnace fire at TPW's production facility in Laramie, Wyoming.  At the time, THP and TPW (collectively, "Tungsten") were insured under a commercial insurance policy providing coverage for business income loss and extra expenses.

1

Based on initial representations regarding the claim, Federal paid a $1 million advance to Tungsten, while continuing to investigate the business income loss. Ultimately, Federal denied coverage on the grounds that (1) the Policy is void because Tungsten made material misrepresentations regarding the claim and (2) in the alternative, Tungsten's losses were less than the $1 million advance.  Federal also filed this lawsuit for declaratory relief, fraud and concealment, restitution, and unjust enrichment.  (*See Compl.* [Doc. 1].)

On September 17, 2021, THP and TPW answered the complaint and filed a counterclaim for a declaration of coverage, breach of contract, and breach of the implied covenant of good faith and fair dealing ("bad faith").  (*See Answer/Counterclaim* [Doc. 6].)

The parties have now filed cross motions for summary judgment and motions to seal.  The primary issues are (1) whether, as a matter of law, Tungsten made misrepresentations or concealments that void the Policy, and (2) interpretation of the Policy's "period of restoration."

The Court decides the motions on the papers, and without oral argument. See Civ.L.R. 7.1.d.1. For the reasons that follow, the Court **GRANTS** the motions to seal [Docs. 40, 44, 58, 66, 73], **GRANTS IN PART** and **DENIES IN PART** Federal's motion [Doc. 47] and **GRANTS IN PART** and **DENIES IN PART** Tungsten's motion [Doc. 39].

## I.   MOTIONS TO SEAL

The parties have filed five motions to seal certain exhibits, an unredacted version of Tungsten's opposition to Federal's motion, and the separate statement of facts.  The basis for the request is that these documents include or refer to "trade secret or other confidential research, technical, cost pricing, marketing, or other sensitive commercial information."  (*See Motions to Seal* [Doc. 40] 1:27–2:8, [Doc. 44] 2:5–14, [Doc. 58] 2:2–11, [Doc. 66] 2:2–10, [Doc. 73] 1:27–2:8.)

2

"Historically, courts have recognized a 'general right to inspect and copy public records and documents, including judicial records and documents.'" <u>Kamakana v. City and County of Honolulu</u>, 447 F.3d 1172, 1178 (9th Cir. 2006) (quoting <u>Nixon v. Warner Commc'ns, Inc.</u>, 435 U.S. 589, 597 & n. 7 (1978)). Although access to judicial records is not absolute, there is a "narrow range" of documents that have traditionally been kept secret for policy reasons: "grand jury transcripts and warrant materials in the midst of a preindictment investigation." <u>Id.</u> (citing <u>Times Mirror Co. v. United States</u>, 873 F.2d 1210, 1219 (9th Cir. 1989)). The importance of this narrow range is that "[u]nless a particular court record is one 'traditionally kept secret,' a 'strong presumption in favor of access' is the starting point." <u>Id.</u> (citing <u>Foltz v. State Farm Mutual Auto. Insurance Company</u>, 331 F.3d 1122, 1135 (9th Cir. 2003)).

"[T]he strong presumption of access to judicial records applies fully to dispositive pleadings, including motions for summary judgment and related attachments." <u>Kamakana</u>, 447 F.3d at 1179. This is "because the resolution of a dispute on the merits, whether by trial or summary judgment, is at the heart of the interest in ensuring the 'public's understanding of the judicial process and of significant public events.'" <u>Id.</u> (quoting <u>Valley Broadcasting Co. v. U.S. Dist. Ct.</u>, 798 F.2d 1289, 1294 (9th Cir. 1986)). "Thus, 'compelling reasons' must be shown to seal judicial records attached to a dispositive motion." <u>Id.</u> (citing <u>Foltz</u>, 331 F.3d at 1136). This standard applies "even if the dispositive motion, or its attachments, were previously filed under seal or protective order." <u>Id.</u> Relying on "a blanket protective order is unreasonable and is not a 'compelling reason' that rebuts the presumption of access." <u>Id.</u> at 1183 (citing <u>Foltz</u>, 331 F.3d at 1138).

Here, the parties have demonstrated that the documents the parties seek to seal include confidential information relating to Tungsten's business, the disclosure of which is likely to be commercially detrimental. See <u>Mezzadri v. Med. Depot, Inc.</u>, 2015 WL 12564223, at *2 (S.D. Cal. Dec. 18, 2015) (sealing defendant's customer lists and sales information); <u>Finjan, Inc. v. Cisco Sys. Inc.</u>, 2019 WL 4168952, *2 (N.D. Cal. 2019)

3

(sealing material revealing operation of proprietary products).  Accordingly, the Court will grant the motions to seal.

However, in their unsealed briefs, the parties cite information and quote portions of the exhibits filed under seal.  To the extent the parties have done so, and there has been no objection, the Court deems the request to seal the information waived.  Thus, if important for the Court's analysis, the information is referred to in this order.  Similarly, the order refers to information included in the sealed documents that falls outside the basis for the request to seal—i.e, is not trade secret or other confidential research, technical, cost pricing, marketing, or other sensitive commercial information.

## II.  BACKGROUND

### A.  The Accident.

Since 1999, THP has marketed, sold, and distributed components and assemblies made primarily from tungsten to the United States military and U.S. military contractors, such as Northrop Grumman.  (*Answer/Counterclaim* ¶ 7; *see also Tungsten P&A* [Doc. 39-1] 2:17–19; *Tungsten Ex. 7 - Sealed* [Doc. 41-1] p. 29.)  TPW manufactures the tungsten for THP at a relatively new production facility in Laramie, Wyoming.  (*Id.*)  Some of the equipment needed to manufacture the tungsten products at the Wyoming facility, including a sintering furnace (the "Furnace") at the center of this dispute, were installed and became operational in approximately April of 2018. (*Tungsten Ex. 20 – Sealed* [Doc 41-3] p. 189.)

On April 20, 2019, there was an accident at the Wyoming facility that resulted in damage to the Furnace, rendering it non-operational and preventing any production at the facility.  (*Tungsten Ex. 7 – sealed* p. 30.)  On August 5, 2019, Tungsten reported that repairs were completed and the Furnace restarted by July 2.  (*Tungsten Ex. 10 – sealed* [Doc. 41-1] p. 48.)  It also reported that it "[f]inished sample testing" and by July 19 production was resumed.  (*Id.*)  This coverage dispute concerns Tungsten's claimed business income loss resulting from the damage to the Furnace.

4

**B.    The Policy.**

Federal issued policy number 3603-73-54 WCE (the "Policy") to Tungsten, which provides property and business loss coverage with a policy period of June 1, 2018 to June 1, 2019.  (*See Policy.*[1])  The Policy covers "direct physical loss or damage to: [¶] **building**; or [¶] **personal property**, [¶] caused by or resulting from a peril not otherwise excluded…."  (*Id.* at p. 242, emphasis in original.)  Under the Business Income With Extra Expense contract, the Policy limit is $5 million (*id.* at 229) and covers "the actual:

- **business income** loss you incur due to the actual impairment of your **operations**; and
- **extra expense** you incur due to the actual or potential impairment of your **operations,**
during the **period of restoration**, not to exceed the applicable Limit of Insurance for Business Income With Extra Expense shown in the Declarations.

(*Id.* at 271, emphasis in original.)  The Policy includes an "Extended Period," which is listed on the Declarations Page as "unlimited."  (*Id.* p. 228.)

Also relevant to this case, the Policy includes a Concealment Or Misrepresentation clause, which states:

This insurance is void if you or any other insured intentionally conceals or misrepresents any material fact or circumstance relating to this insurance at any time.

(*Policy* at p. 344.)


**C.    The Claim.**

On May 20, 2019, Tungsten's CFO, Christopher Witt, submitted a claim under the Policy for the April 20 accident (the "Claim").  (*Federal Ex. 7-Sealed* [Doc. 48-2].)  The letter stated that water damage to the Furnace rendered it nonoperational and estimated it

---

[1] The Policy is attached as Tungsten's Exhibit 21 [Doc. 39-7] and Federal's Exhibit 4 [Doc. 47-7].  All page citations are to Tungsten's Exhibit 21, which will be referred to as the "Policy."

would be out of production for at least ten weeks.  (*Id.* at CF 01408.)  The letter also stated the company's "Business Income Loss during the period of restoration is significant" and represented that the Furnace "has the capacity to process 700 kilograms of Tungsten Alloy per day running 24/7."  (*Id.*)  Based on the alleged "capacity" and the estimated ten-week repair and down-time period, Tungsten claimed its "Business income loss will accumulate to $5,500,250, which exceeds the $5,000,000 policy limit."  (*Id.*)

After receiving the Claim, Federal retained the accounting firm of Matson Driscoll and Damico, LLP ("MDD") to assist with the investigation and quantification of the Claim.  (*Jaeger Decl.* [Doc. 47-2] ¶ 6.)  On May 23, 2019, MDD sent a letter to Tungsten requesting certain financial documents. (*Federal's Ex. 9* [Doc. 47-11].)  Approximately two weeks later, MDD emailed Christopher Witt to request, among other items:

> 3. Production reports or production history for all products manufactured using the impacted furnace from 2017 through present and continuing through the end of the claimed loss period, as available.
>
> 4. Supporting records or calculations for the "700 kilograms of Tungsten Alloy per day" figure quoted in [the May 20 Claim letter[2]].

(*Jaeger Decl.* ¶ 7; *Federal's Ex. 10 - Sealed* [Doc. 48-4] CF 01072.)

### D.   **Tungsten's June 12, 2019 Letter and MDD's Preliminary Report.**

In this lawsuit, Federal contends the Policy is void because Tungsten violated the Concealment Or Misrepresentation clause.  This theory relies heavily on two documents: Christopher Witt's June 12 letter responding to MDD's request for information, and MDD's Preliminary Report of Tungsten's Claims.

On June 12, 2019, Witt responded to MDD's email requesting production reports and history for the Furnace, and support for the May 20 Claim letter's representation that

---

[2] *See Federal Exhibit 15 – Sealed* [Doc. 48-7] 167:12–168:25, 171:8–11, 172:6–173:18 (clarifying quoted language was in May 20 Claim letter).

6

the Furnace had the "capacity" to process 700 kg per day.  (*Jaeger Decl.* ¶ 8; *Federal Ex. 11 – Sealed* [Doc. 48-5].)  In response to those requests, Witt listed "revenue recognition [figures] for shipments" from October 2017 through March 2018 as "an example of the likely Revenue recognition performance" to be expected.  (*Id.* at CF 01114.)  He then explained that in December 2018, the Furnace was "shut down" for "certain maintenance, upgrades and improvements" that were "completed during January 2019."  (*Id.*)  The Furnace was then restarted and "the Company began to run qualification batches… to prepare for high-volume production, to optimize output, and to refine and perfect the processes necessary [sic] compatible with the upgrades and improvements that were completed."  (*Id.* at CF 01114–01115.)  Witt then stated,

> Beginning in January 2019, the Company began to run qualification batches… through the… Furnace to optimize the production rate, yeilds [sic] and quality….  By April 2019, we had optimized the sintering process, producing successful high quality and high yeild [sic] outputs using a boat….  This process was proven to produce… or higher yeilds [sic] at the rate of 720 Kgs per day.

(*Federal Ex. 11 – Sealed* at CF 01115.)  However, Witt also stated, "[d]ue to these events and circumstances," Tungsten could not "calculate the exact loss of production by looking back at the past history, but rather, by measuring the production rates after the repairs are completed and the Furnace is back in full production mode."  (*Id.*)  The letter concluded that under the "Business Income With Extra Expense Policy Limit of $5,000,000… Tungsten respectfully demands a preliminary advance payment… in the amount of at least $2,000,000."  (*Id.* at CF 01116.)

On June 28, 2019, MDD sent Federal a preliminary report regarding Tungsten's Claim.  (*Jaeger Decl.* ¶ 9; *Federal Ex. 12 – Sealed* [Doc. 48-6].)  The report incorrectly attributed the October 2017 through March 2018 revenue listed in the June 12 letter to tungsten produced by the Furnace.  (*See Federal Ex. 12 – Sealed* at CF 00964 (in ¶15, attributing "the sintering furnace and its end-product" to the fulfilled purchase order referenced in ¶ 12).)  In fact, the revenue was from tungsten manufactured in China.

7

(*Federal Ex. 15 – Sealed* [Doc. 48-7] at 41:22–42:16.)  Largely based on this mistake, MDD found Tungsten's statement in the May 20 Claim letter regarding the Furnace's "estimated daily… throughput of 700kg" was achievable and reasonable, and estimated its business income loss was $2,757,370.  (*Id.* at CF 00967 (¶ 20), CF 00969 (¶ 29).) However, in a section of the report entitled "potential issues / limitations," MDD stated that Tungsten's "estimated furnace throughput rate of 700 kilograms per day is the biggest potential area of concern…."  (*Id.* at CF 000968 (¶ 23).)

On July 17, 2019, MDD sent a copy of the preliminary report to Tungsten.  (*Jaeger Decl.* ¶ 9; *Federal Ex. 13* [Doc. 47-12].)  The email stated, "[a]s you review the report, we ask that you confirm that the commentary included therein is factually accurate.  **If you find any of the commentary to be inaccurate, please let us know so that we can update our report**…."  (*Federal Ex. 13* at CF 00584, emphasis added.)  There is no evidence Tungsten ever contacted MDD to clarify that the listed revenue did not come from tungsten produced by the Furnace.

### E.  <u>Allegations that Tungsten Misrepresented the Furnace's Pre-Loss Production and Federal's Continued Investigation.</u>

Federal contends that "[b]eginning on or about July 19, 2019, after payment in the amount of $1 million had been issued to THP/TPW, FIC began to receive communications from current and former employees of THP/TPW (including its executive vice president…) advising that THP/TPW were submitting a fraudulent claim to FIC and lying about their pre-loss production levels to support that claim."  (*Jaeger Decl.* ¶ 12.)  Federal was allegedly told that "in stark contrast to the claim facts advanced, THP/TPW had not completed its research and development phase for tungsten production and had no meaningful production levels before this loss."  (*Id.*)  Additionally, Federal was "advised that the pre-loss production documentation provided to FIC to support its claimed tungsten production losses was actually from the re-sale of Chinese

8

manufactured tungsten rather than from production at TPW's facility where this loss allegedly occurred." (*Id.*)

Meanwhile, MDD continued to request information related to Tungsten's Claim, particularly information about "[p]re-loss production history of the sintering furnace, preferably in terms of kilograms per day…." (*Tungsten Ex. 11 - Sealed* [Doc. 41-1] at 55.)  Federal also began taking examinations under oath of Tungsten employees.

On December 19, 2019, Federal examined Christopher Witt.  During his exam, Witt clarified that all of the October 2017 through March 2018 revenue referenced in the June 12 letter was from product "manufactured in China" and not from the Furnace. (*Federal Ex. 15 – Sealed* at 41:22–42:16.)  Regarding the statement in the June 12 letter that by "April 2019" Tungsten had "optimized the sintering process," which "was proven to produce… at the rate of 720 Kgs per day," Witt confirmed he was representing that the Furnace actually achieved the stated production rate.  (*Id.* at 177:6–178:14.)  He also testified Joe Serov provided him the information so Witt could forward to Federal to calculate the amount of business income loss.  (*Id.* at 177:6–179:3.)

The next day, Federal took the examination of Serov, Tungsten's President. (*Federal Ex. 17 – Sealed* [Doc. 48-9] at 11:3–5.)  Serov testified that the day before the accident, the Furnace was producing "very little" product in terms of kilograms.  (*Id.* at 29:20–30:1.)  He stated the Furnace was at the "R&D" phase, and "[w]e were producing at the very, very slow rate…."  (*Id.*)  Nevertheless, he contended Tungsten was approximately 4 days away from having the "correct recipe… [to] start producing."  (*Id.* at 30:8–15.)

Nine months later, on September 21, 2020, Federal took the examination of John Patrick Batache, Tungsten's CEO, who contradicted Serov's testimony.  Batache testified that just before the accident, the Furnace was producing up to 7,600 kg per week, or 1085 kg per day.  (*Federal Ex. 16 – Sealed* [Doc. 48-8] at 14:21–15:13.)  He further claimed that his testimony was based on his review of "records," that he had a "vivid" memory of

the period and that his claimed production rate was of actual production, not capacity. (*Id.* at 60:16–22.)

### F.  Tungsten's Revised Claim.

 In January 2021, Tungsten submitted a revised Sworn Statement in Proof of Loss based on the assertion that the previous representations about the Furnace's 720 kg per day rate were understated.  (*Tungsten Exhibit 14 – Sealed* [Doc. 41-1] at 70, 75.)  In the email transmitting the revised claim, Tungsten asserted "the most accurate number for actual production, but for the accident, is 7600 kg per week," which was "based on pre-accident productivity, using all current data…."  (*Id.* at 70.)  Tungsten, therefore, increased its business income loss claim from $5,500,250 to $9,272,172.  (*Id.*)

On May 17, 2021, MDD issued its final report.  (*Federal Ex. 22 – Sealed* [Doc. 48-14].)  MDD concluded that Tungsten suffered, at best, lost or delayed production totaling $63,890.  (*Id.* ¶ 71.)

On July 1, 2021, Federal sent a letter denying Tungsten's Claim on two grounds. (*See Tungsten Ex. 18 – Sealed* [Doc. 41-3].)  First, the letter stated that Tungsten intentionally misrepresented and concealed material facts during the claims process and thus the Policy was void.  (*Id.* at 169.)  Second, Federal asserted that even if the Policy was not void because of the misrepresentations and concealments, Tungsten's actual losses were significantly less than the $1 million Federal had advanced.  (*Id.*)

### III.  STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial.  Id. at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159–60 (1970).

If the moving party meets this initial burden, the nonmoving party cannot avoid summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." In re Citric Acid Litig., 191 F.3d 1090, 1094 (9th Cir. 1999) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Ford Motor Credit Co. v. Daugherty, 279 Fed. Appx. 500, 501 (9th Cir. 2008) (citing Celotex, 477 U.S. at 324).  Additionally, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party.  See Matsushita, 475 U.S. at 587.

1    **IV.**    **DISCUSSION**

2       Both motions require resolution of two issues: (1) interpretation of the Policy's

3 "period of restoration" and (2) whether, as a matter of law, Tungsten made

4 misrepresentations or concealed facts that void the Policy.  In addition, Federal's motion

5 seeks summary adjudication of Tungsten's bad-faith claim.

6

7       **A.**      **The Period of Restoration.**

8       The parties' motions require an interpretation of the "period of restoration" in the

9 Policy.  Federal seeks summary judgment on Tungsten's counterclaims arguing that the

10 $1 million advanced in July 2019 exceeds Tungsten's total losses.  (*Federal Notice* [Doc.

11 47] 1:20–27; *Federal P&A* [Doc. 47] 16:15–17.)  This argument is based on Federal's

12 interpretation of the period of restoration, which would limit Tungsten's business income

13 loss to the Furnace's pre-accident production.  (*Federal P&A* 16:18–21.) Tungsten's

14 motion requests a declaration that "the 'period of restoration,' which is used to calculate

15 the amount of loss following a covered accident, is determined by however long it takes

16 to return Tungsten's business to where it would have been but for the accident, not

17 simply where it started prior to the accident…." (*Tungsten Notice* [Doc. 39] 1:10–16.[3])

18

19       **1.**      **California insurance law.**

20       The interpretation of an insurance policy is governed by the ordinary rules of

21 contract interpretation. <u>Palmer v. Truck Ins. Exchange</u>, 21 Cal. 4th 1109, 1115 (1999).

22 The fundamental goal in interpreting an insurance policy is to ascertain the parties'

23 mutual intentions. <u>Vons Cos., Inc. v. United States Fire Ins. Co.</u>, 78 Cal. App. 4th 52, 58

24 (2000). Where possible, those intentions should be inferred solely from the policy's

25

26

27 [3] Aside from disputing Tungsten's interpretation, Federal also contends Tungsten's request should be denied as "superfluous and moot" because the Policy speaks for itself.  (*Federal Opp'n* 25:14–16.)

28 Because Federal's motion also requires an interpretation of the period of restoration, the Court must address the term's meaning.

21-CV-1197 W (MDD)

written terms. <u>AIU Ins. Co. v. FMC Corp.</u>, 51 Cal. 3d 807, 822 (1990). Thus, policy language that is clear and explicit governs. <u>Id.</u>

A policy term is ambiguous when it is susceptible to two or more reasonable constructions. <u>EMMI Inc. v. Zurich American Ins. Co.</u>, 32 Cal. 4th 465, 470 (2004). Courts, therefore, will not adopt "a strained or absurd interpretation in order to create an ambiguity where none exists." <u>Bay Cities Paving & Grading, Inc., v. Lawyers' Mutual Ins. Co.</u>, 5 Cal. 4th 854, 867 (1993). Additionally, ambiguity cannot be found in the abstract. <u>Id.</u> Rather, the "proper question is whether the word is ambiguous in the context of this policy and the circumstances of this case." <u>Id.</u> at 868 (emphasis in original). The "policy 'must be construed as an entirety, with each clause lending meaning to the other.'" <u>Carmel Development Co. v. RLI Ins. Co.</u>, 126 Cal.App.4th 502, 507 (2005). "Further, 'where the insuring clause of a policy clearly covers a risk, and a subsequent limiting clause does not clearly exclude it, the risk will be deemed to be covered by the policy.'" <u>Kilroy Industries v. United Pacific Ins. Co.</u>, 608 F.Supp. 847, 855 (C.D. Cal. 1985) citing <u>Holz Rubber</u>, 14 Cal.3d at 37. Where an ambiguity exists, however, it should be resolved against the insurer. <u>EMMI, Inc.</u>, 32 Cal. 4th at 470–471 (citing <u>Safeco Ins. Co. of America v. Robert S.</u>, 26 Cal. 4th 758, 763 (2001)).

### 2.   <u>The Period of Restoration is not limited by pre-loss production.</u>

In this case, the period of restoration did not necessarily end when the Furnace reached its pre-accident production rate.  The Policy's Business Income With Extra Expense contract covers Tungsten's business income loss during the "period of restoration."  (*See Policy* at 271.)  The period is defined, in relevant part, as follows:

**Period of restoration** means the period of time that, for **business income**, begins:
A.      immediately after the time of direct physical loss or damage by a covered peril to property; or
B.      ….

\* \* \*

13

**Period of restoration** will continue until your **operations** are restored, with reasonable speed, to the level which would generate the **business income** amount that would have existed if no direct physical loss or damage occurred, including the time required to:

A.    repair or replace the **property**; or

B.    repair or replace the **property** to comply with the minimum standards of any enforceable ordinance or law that:

    1.    regulates the repair or replacement of any property;

    2.    requires the tearing down of parts of any property not damaged by a covered peril; and

    3.    is in force prior to the date of the direct physical loss or damage,

not to exceed the applicable number of days shown as Extended Period in the Declarations, beginning on the date that:

- for manufacturing risks, the lost or damaged **property** is actually repaired or replaced and production capability is restored to the level that existed prior to the date the direct physical loss or damage occurred; or

- for all other risks, the lost or damaged **property** is actually repaired or replaced and your operations are restored.

The expiration date of this policy will not cut short the period of restoration.

(*Id.* at 364, emphasis in original.)  "Operations" is defined as "your business activities occurring at your premises… prior to the loss or damage."  (*Id.* at 636.)

Federal's interpretation is not supported by this provision for two reasons.  First, the Policy's plain text does not say what Federal contends.  The period of restoration ends when "operations are restored… to the level which would generate the **business income** amount *that would have existed if no direct physical loss or damage occurred*…."  (*Policy* at 364, italics added.)  There is no mention of pre-loss operations, pre-loss production, or pre-loss business income, and thus Federal's proposed interpretation lacks merit.  See Ochsner Clinic Found. v. Lexington Ins. Co., 226 F. Supp. 3d 658, 679 (E.D. La. 2017) (rejecting insurer's argument that restoration "to the condition that would have existed had no loss occurred" means restoring the "business back to its pre-loss condition or to allow a business 'to get back to its prior level of production.'")

14

Second, Federal's interpretation is contradicted by the Policy's definition of the start of the Extended Period included in the same provision.  As set forth above, the Extended Period begins when, "the lost or damaged **property** is actually repaired or replaced *and production capability is restored to the level that existed prior to the date the direct physical loss or damage occurred*…."  (*Policy* at 364, italics added.)  Unlike the end of the period of restoration, the italicized language unambiguously ties the start of the Extended Period to when pre-accident production capability is restored.  This language demonstrates that if the Policy intended to also tie the end of the period of restoration to pre-accident production or operations, it would have used the same or similar language.

Federal nevertheless argues that its interpretation is supported by the Loss Determination provision.  That provision identifies "relevant sources of information" that Federal "may utilize" in determining the amount of loss.  (*Policy* at 279.)  The sources include the insured's (1) financial records and accounting procedures; (2) bills, invoices, and other vouchers; (3) deeds, liens, and contracts; (4) status and feasibility reports; and (5) budgeting and marketing records.  (*Id.*)  The provision then states:

> The amount of **business income** loss will be determined based on the:
> - net income of your business before the direct physical loss or damage occurred;
> - the likely net income of your business if no loss or damage occurred, but not including any **business income** that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the covered loss on customers or on other businesses; and
> - your continuing operating expenses, including your continuing normal payroll expenses, necessary to resume **operations** with the same quality of service that existed just before the direct physical loss or damage.

(*Id.*, emphasis in original.)  With respect to the "sources of information," the provision does not limit financial records, bills, etc., that reflect only pre-accident information.  Thus, this language does not support Federal's interpretation.  Moreover, the amount of business income loss is not determined solely by net income before the accident, but also

15

the "likely net income if no loss or damage occurred." If, as Federal argues, Tungsten's business income loss was limited by its pre-accident production, "the likely net income" language would be superfluous.

Finally, Federal relies on a number of cases as support for the contention that under the period of restoration, Tungsten's business income loss is limited to pre-accident production levels. But as Tungsten correctly points out, the cases Federal cites do not support its interpretation. For example, Federal relies heavily on <u>Ramaco Resources, LLC v. Federal Ins. Co.</u>, 589 F. Supp. 3d 567, 578–579 (S.D. W.Va. 2022), which interpreted the same policy language at issue in this case. However, unlike this case, the insured's coal production was at the same level for the 9 months before the accident. Following temporary repairs, the insured quickly resumed the same level of production, which remained the same even after final repairs. Relying on the records of the insured's production, the district court found the period of restoration ended when the temporary repairs were completed. <u>Id.</u>

<u>Ramaco</u> is easily distinguishable from this case because, unlike Tungten, the insured's level of production was the same before the loss and after the completion of temporary and final repairs. These facts established that if the accident had not occurred, the insured's coal production would have continued at the same rate. Accordingly, the period of restoration ended when the temporary repairs were completed because at that point the insured's operations were restored to "the level which would generate the **business income** amount that would have existed if no direct physical loss or damage occurred."

In contrast, here, Tungsten contends it was in the process of ramping-up or increasing "operations" before the accident. If Tungsten can prove its operations would have continued to increase after the accident, the period of restoration would not necessarily end when the Furnace was back to pre-loss production, but instead when Tungsten's operations were restored "to the level which would generate the **business income** amount that would have existed if no direct physical loss or damage occurred."

16

Because the Court finds the period of restoration does not necessarily end with the restoration of pre-accident production levels, the Court denies Federal's request for summary judgment of Tungsten's counterclaims.[4]

**B.    Tungsten's Alleged Misrepresentations or Concealments.**

Federal seeks summary judgment on the ground that the Policy is void because "THP/TPW made material misrepresentations and concealments in order to artificially inflate the amount of their claimed loss to FIC[.]" (*Federal Notice* 1:20–27.)  In support of this argument, Federal cites eight alleged misrepresentations or concealments. (*Federal P&A* 3:4–21.)  Tungsten seeks partial summary judgment as to Federal's Fraud and Concealment causes of action on the basis that "Federal has insufficient evidence to support its concealment and misrepresentation claims and defenses…." (*Tungsten Notice* 1:10–17.)  Tungsten also argues that Federal's motion should be denied on procedural grounds because Federal failed to cite particular parts of exhibits, one of which was over two thousand pages.  (*Tungsten Opp'n* 13:26–15:13.)  For the reasons that follow, the Court finds disputed issues of material fact preclude summary judgement on whether Tungsten's alleged misrepresentations or concealments void the Policy.

**1.    Tungsten's procedural argument.**

Tungsten argues Federal's motion is procedurally improper because it fails to "cite to specific evidence to support its allegedly undisputed facts." (*Tungsten Opp'n* 13:26–28.)  According to Tungsten, rather than citing specific pages in its exhibits, "Federal refers the Court to nearly 4,000 pages of exhibits without identifying any specific evidence to support its allegedly undisputed facts." (*Id.* 14:1–5.)

---

[4] This finding should not be construed as approval of or agreement with Tungsten's contention that the period of restoration continued until September 2020 or determination of its business income loss is based on the Furnace's alleged capacity of 7,600 kg per week.  (*See e.g., Federal Ex. 22 - Sealed* ¶ 49.)

17

Federal Rule of Civil Procedure 56(c)(1)(A) requires that parties support material facts with citations to the "particular parts" of the supporting exhibits:

> (1) ***Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the records, including depositions, documents….
>
> * * *
>
> (3) ***Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

Despite Rule 56's requirements, Federal has not cited to "particular parts" of Exhibit 5, which is over 2,000 pages. Accordingly, the Court will not consider Federal's citations to Exhibit 5.[5]

## 2.    California law - misrepresentation clauses.

"A fraud and concealment clause in an insurance policy generally voids the policy upon the insured's attempts to deceive the insurer." <u>Leasure v. MSI Ins. Co.</u>, 65 Cal.App.4th 244, 248 (1998) (citing <u>Cummings v. Fire Ins. Exch.</u>, 202 Cal.App.3d 1407, 1415–18 (1988)). "The validity of an insurance contract, however, is not affected by concealment or misrepresentations that do not relate to material matters." <u>Id.</u> (citing

---

[5] Federal also frequently fails to cite to particular parts of Exhibit 15 (208 pages), Exhibit 16 (308 pages), Exhibit 17 (202 pages) and Exhibit 18 (126 pages). In addition to failing to cite to particular parts of its exhibits, Federal frequently fails to identify supporting evidence immediately after a statement of fact. Instead, Federal often waits until the end of the paragraph to cite all the evidence supporting different facts alleged in the same paragraph. (*See e.g., Federal P&A* 6:21–24.) This problem is compounded by citations that do not support any of the alleged facts. (*See e.g. id.* 6:2–7, citing Exhibits 9 and 10, which do not support the fact alleged.)

Exacerbating Federal's evidentiary citations is its failure to analyze any of the alleged misrepresentations / concealments in its argument section. After listing the misrepresentations / concealments in the factual background, Federal does not mention them in the argument section. (*See Federal P&A* 11:14–24:24.) While that section includes a general discussion of what constitutes "materiality" and an "intent to deceive," there is no meaningful attempt to apply the law to the various misrepresentations / omissions.

Olson v. Standard Marine Ins. Co. 109 Cal.App.2d 130, 137 (1952)).  Additionally, false statements must be "knowingly and intentionally made, with the intent to deceive or defraud the insurer, to void the policy."  Ram v. Infinity Select Ins., 807 F.Supp.2d 843, 853 (N.D. Cal. 2011) (citing Pedrotti v. Am. Nat'l Fire Ins. Co. of Columbus, Ohio, 90 Cal.App. 668, 671 (1928)).  "[W]here a plaintiff knowingly and willfully, with intent to deceive the insurer, makes false statements as to material matters in the course of the insurer's investigation of his claim, the defendant is entitled to summary judgment on the plaintiff's breach of contract claim."  Id. (citing Cummings, 202 Cal.App.3d at 1418–19).

As mentioned above, Federal contends the Policy is void based on eight alleged misrepresentations or concealments.  (*Federal P&A* 3:4–21.)  The Court will evaluate each separately.

### a)      Misrepresenting the Furnace's pre-loss production rate.

Federal contends Tungsten misrepresented that it had "achieved high quality tungsten production at a rate of 720 kg per day before the loss."  (*Federal P&A* 3:4–5.) In its motion and opposition, Tungsten argues Federal cannot show it misrepresented the pre-accident production rate because any such statements were "by their plain language, estimates and extrapolations of potential production capacity—*not* actual production rates achieved on a regular basis prior to the Furnace Incident."  (*Tungsten P&A* 14:27–15:4; *see also Tungsten Opp'n* 7:22–24.)  Tungsten also contends the representations regarding the Furnace's pre-loss capacity were not material and there was no intent to deceive.  The Court will evaluate each element of this claim separately.

### (1)     Tungsten misrepresented the Furnace's pre-loss production rate.

When Tungsten first made the Claim, the amount of business income loss it asserted it "will" incur was based on the Furnace running at "capacity" when the accident occurred.  (*Federal Ex. 7 – Sealed* at CF 01408.)  In the May 20 Claim letter, Tungsten

stated that its "Business Income Loss during the period of restoration is significant." (*Id.*) As support, Tungsten represented that the Furnace "has the capacity to process 700 kilograms of Tungsten Alloy per day running 24/7," which "is now lost for at least ten (10) weeks." (*Id.*) The letter continued, as a "direct result of the damage to the Sintering Furnace," Tungsten "is" losing $79,575 per day "since April 20, 2019[,]" which "*will* accumulate to $5,500,250. (*Id.*, emphasis added.) This amount of business income loss would have required the Furnace to operate at capacity, every day, for the entire 10-week period. Contrary to Tungsten's argument that it was simply extrapolating about the Furnace's "potential production capacity—*not* actual production rates" (*Tungsten P&A* 14:27–15:4; *Tungsten Opp'n* 7:22–24), the May 20 Claim letter was representing that the Furnace would have been operating at 700 kg daily for the entire 10-week period.

Even if a reasonable jury could find the May 20 Claim letter did not misrepresent the Furnace's pre-loss production, Tungsten's June 12 letter did. On June 12, Witt sent the letter purporting to respond to MDD's requests for "[p]roduction reports or production history for … the impacted furnace" and "[s]upporting records or calculations for the '700 kilograms of Tungsten Alloy per day' figure" in the May 20 Claim letter. (*Federal's Ex. 10 – Sealed* at CF 01114.) After discussing the Furnace's shut down in December 2018 "for certain maintenance, upgrades and improvements," the letter stated that by April 2019, Tungsten had "optimized the sintering process" for the Furnace and that "[t]his process was *proven*" to produce "at a rate of 720 kgs per day." (*Id.* at CF 01115, emphasis added.)

During Witt's December 19, 2019 EUO, he testified that when he made the 720 kg per day representation, (1) he believed the Furnace had actually achieved that rate by April 2019, (2) he got the information from Serov for the purpose of communicating it to Federal, and (3) they intended Federal to use the information to calculate Tungsten's business income loss. (*Federal Ex. 15 – Sealed* at 177:6–179:3.) This testimony contradicts Tungsten's argument that the June 12 letter was simply estimating the Furnace's "potential" production capacity. (*See Opp'n* 7:22–24.) When Witt made the

20

representation, he was asserting the Furnace had actually achieved 720 kg per day before the accident.

The record also establishes Tungsten's representations in the May 20 Claim letter and June 12 letter were false.  There is no evidence the Furnace ever produced 700 or 720 kg per day before the accident, not even for a single day.  To the contrary, in December 2019, Serov testified the Furnace achieved "very little" production before the accident.  (*Federal Ex. 17 – Sealed* at 29:20–30:1.)  Batache also eventually admitted the Furnace never achieved 700 kg before the accident.  (*Federal Ex. 26* [Doc. 47-16] 50:10–20.)  And, in its motion and opposition, Tungsten now contends that at trial, it will prove the Furnace's pre-accident production was approximately 570 kg per day, well short of the claimed 700 or 720 kg per day. (*See Tungsten P&A* p. 5, fn. 2; *see also Tungsten Opp'n* p. 3, fn. 1.)

Alternatively, Tungsten argues Federal cannot prevail on this misrepresentation because in October 2017, Federal knew (1) the Furnace would not be operational until approximately April 2018 and (2) the Furnace produced relatively few fragments between April 2018 and 2019.  (*Tungsten P&A* 14:17–22.)  The Court is not persuaded by this argument.  As support, Tungsten cites Marentes v. State Farm Mut. Auto. Ins. Co., 224 F.Supp.3d 891 (N.D. Cal. 2016).  Marentes involved an insured's cause of action for fraudulent concealment, which requires plaintiff to prove he or she was unaware of the concealed information.  Id.  In contrast, here, Tungsten affirmatively misrepresented the Furnace's rate of production.  More importantly, Federal is suing for breach of the Policy, not the tort of fraud.  Thus, the issue is whether as a matter of contract law, Tungsten's conduct voids the Policy.  The Concealment Or Misrepresentation clause states that the Policy is void if Tungsten "intentionally conceals or misrepresents any material fact or circumstance relating to this insurance at any time." (*Policy* at 344.)  Nothing in the clause requires that Federal also remain unaware of the concealment or misrepresentation until after its coverage determination.

21

Tungsten also fails to explain how either fact would have notified Federal that Tungsten's representations about the Furnace's pre-accident production rate were false. This is particularly true given Tungsten's contention that when the accident occurred, the Furnace was in the process of ramping up after the December 2018 shut down for modifications.  Under this theory, it is reasonable to assume the Furnace would have little production during the ramp-up process.  As for Federal's knowledge that the Furnace did not become operational until April 2018, that was a year before the accident occurred. Tungsten does not explain why Federal should have believed it would take a year for the Furnace to achieve 720 kg per day.

### (2)     The Furnace's pre-loss production rate was material.

Tungsten next contends that the misrepresentation could not be material because "pre-incident production levels are not relevant to the inquiry and thus not material to the calculation of Tungsten's business income loss." (*Tungsten P&A* 16:24–26.)  In support of this argument, Tungsten argues the Policy "makes clear that Federal must look to Tungsten's *post*-incident production numbers to accurately determine its business loss." (*Id.* 17:3–5.)  The argument lacks merit for several reasons.

Nothing in the Policy limits Federal's assessment of Tungsten's business income loss to post-incident production.  To the contrary, the Policy's Loss Determination provision specifically states that the "amount of **business income** loss will be determined based on the: [¶] net income of your business *before the direct physical loss or damage occurred*," as well as the likely net income if no loss had occurred.  (*Policy* at 279, emphasis added.)  Additionally, the provision states that in determining the amount of loss, Federal "may utilize relevant sources of information, including: [¶] status and feasibility reports…."  (*Id.*)  Under this provision, Tungsten's "income before the loss," as well as its status and feasibility reports relating to that income are material to Federal's determination of the amount of lost business income.  See <u>Cummings</u>, 202 Cal.App.3d at 1417 ("if the misrepresentation concerns a subject reasonably relevant to the insured's

22

investigation, and if a reasonable insurer would attach importance to the fact misrepresented, then it is material.").

Additionally, the undisputed facts confirm the Furnace's pre-accident production rate was material.  There is no dispute that Tungsten's representations regarding the Furnace's pre-accident production rate were central to MDD's evaluation of the amount business income loss.  (*Federal Ex. 12 - Sealed* at CF00967 (¶ 20) and CF00969 (¶ 29).)  Because MDD found the representation regarding the Furnace's pre-accident rate was achievable and reasonable, the preliminary report found Tungsten's loss exceeded $2 million, which led Federal to pay the $1 million advance.  (*Id.* at CF00969 (¶ 29).)

Finally, Tungsten's argument is also contrary to case law:

> …historical sales figures reflect a business's experience before the date of the damage or destruction and predict a company's probable experience had the loss not occurred, and that the strongest and most reliable evidence of what a business would have done had the loss not occurred is what it had been doing in the period just before the interruption.

Ramaco, 589 F.Supp.3d at 580 (quoting Catlin Syndicate Ltd. v. Imperial Palace of Miss., Inc., 600 F.3d 511, 514 (5th Cir. 2010) (brackets omitted)).

For these reasons, the Court finds Tungsten's misrepresentations were material.

### (3)   A dispute exists regarding Tungsten's intent to deceive.

The final issue is whether the misrepresentation was made with an intent to deceive.  With respect to this issue, a disputed issue of fact exists.  During Witt's EUO, he clarified that he had no first-hand knowledge about the information included in the June 12 letter, and instead was relying on Serov.  (*Federal Ex. 15 – Sealed* at 176:5–177:19, 180:15–21.)  The next day, Serov testified that Tungsten did not achieve the claimed production level and was still in the R&D phase.  (*Federal Ex. 17 - Sealed* 29:20–30:1.)  Serov further testified that at the time of the accident, "[w]e were producing at the very, very slow rate…."  (*Id.*)  Based on these statements, a reasonable jury could find that Tungsten did not intend to deceive Federal when it misrepresented

23

the Furnace's pre-accident production in the May 20 Claim letter and June 12 letter.  This is particularly true given that Witt's and Serov's testimony occurred in December 2019, more than a year and a half before Federal made its coverage determination.  (*See Tungsten Ex. 18 – Sealed*.)

Nevertheless, there is also evidence suggesting an intent to deceive.  Despite Witt's and Serov's testimony, Batache later testified that before the accident, the Furnace's actual production was between 7,000 and 7,600 kilograms per week, or 1000 to 1085 kg per day.  (*Federal Ex 16 - Sealed* at 12:21–13:13, 60:16–22.)  Then on June 25, 2021, Tungsten submitted the revised proof of loss based on the representation that when the accident occurred, the Furnace's pre-loss production was 7600 kg per week.  (*Federal Ex. 20 – Sealed* [Doc. 48-12] at Ex. A.)  There is no evidence supporting these representations.  To the contrary, Batache's May 10, 2022 deposition testimony establishes the representations were not true.  (*Federal Ex. 26* 50:10–20.)  Based on these facts, a reasonable jury could find Batache's EUO testimony and Tungsten's revised Claim establish an intent to misrepresent the Furnace's pre-accident production.

For these reasons, the Court denies both parties motions regarding this alleged misrepresentation.[6]

      **b)**    <u>**Concealing that the Furnace did not achieve the claimed pre-loss production rate.**</u>

Federal contends the Policy is void because Tungsten concealed that it never achieved the claimed production rates before the loss.  (*Federal P&A* 3:5–6.)

---

[6] Federal's reliance on <u>Cummings</u>, 202 Cal.App.3d 1407 and <u>Ram</u>, 807 F.Supp.2d 843 is misplaced because both involved insureds who admitted lying to the insurance company with the intent to deceive.  In <u>Cummings</u>, the court found an intent to deceive was established as a matter of law because plaintiff admitted she lied and "did so with the intent that defendant not find out the actual facts."  <u>Id.</u> at 1418.  In <u>Ram</u> the court found there was no genuine issue of fact because plaintiff admitted "to making knowingly false statements with the intent that Infinity rely on those statements."  <u>Id.</u> at 856.

As discussed above, the May 20 Claim letter and the June 12 letter misrepresented the Furnace's pre-loss production.  Witt then confirmed that his statements in the June 12 letter were about actual production, not estimations.  In addition to these misrepresentations, there is no dispute MDD's analysis was based on its assessment that the claimed production was achievable and reasonable.  Nor is it disputed that MDD's preliminary analysis was sent to Tungsten, who was asked to review the letter and make corrections.[7]  There is no evidence Tungsten responded to MDD's request and clarified that the Furnace had never actually produced at the alleged rate before the accident.  Finally, there is no dispute that Tungsten's revised Claim is based on representations that the Furnace's pre-accident production was greater than 720 kg per day.  A reasonable jury could find this evidence establishes Tungsten concealed that the Furnace had not achieved the claimed rate of production before the accident.

However, the evidence demonstrates Serov testified that before the accident, the Furnace was still in the R&D phase and was "producing at the very, very slow rate…." (*Federal Ex. 17 – Sealed* at 29:20–30:1.)  Batache's subsequent testimony contradicted Serov.  (*Federal Ex 16 - Sealed* at 12:21–13:13, 60:16–22.)  Thus, as discussed in the previous section, a disputed issue of fact exists regarding an intent to deceive.

---

[7] In the Separate Statement of Facts, Tungsten lists as "disputed" the fact that MDD sent the June 28, 2019 preliminary report to Tungsten.  (*Jt. Sep. Statement* [Doc. 67] No. 15.)  According to Tungsten: "MDD revised the report and sent the revised version to Tungsten on or around July 17, 2019.  Federal has not attached that version of MDD's preliminary report to Mr. Jaeger's declaration, nor has it provided it in the evidence submitted in support of its motion or opposition."  (*Id.* No. 15.)  This attempt to create a dispute is unavailing for two reasons.  First, Tungsten failed to cite evidence supporting its statement that the June 28, 2019 report was not attached to the July 17, 2019 email.  In contrast, Federal's statement of fact is supported by evidence.  The email specifically states, "[a]attached is a summarized version of our preliminary analysis **as submitted to** [Federal]."  (*Federal Ex. 13* at CV00583, emphasis added.)  Additionally, Jaeger's declaration states that "[t]he MDD report that is attached to this email communication, identified as **Exhibit "13"**, already identified and included as **Exhibit "12"**.  (*Jaeger Decl.* ¶ 9, emphasis in original.)  Because Federal supports the stated fact with evidence, and Tungsten does not support its "dispute" with evidence, the Court concludes the fact is undisputed.

### c)   Misrepresenting Tungsten's use of boats before the accident.

Federal contends the Policy is void because Tungsten misrepresented it achieved the 720 kg level of production by using equipment (i.e., boats) that it did not purchase until after the loss. (*Federal P&A* 3:7–9.)  There is conflicting evidence regarding when Tungsten purchased the boats.  During his deposition, Dennis Omanoff testified that Tungsten had some boats before the accident. (*Tungsten Ex. 39 – Sealed* [Doc 59-2] at 224.)  In contrast, Serov testified that the boats were purchased after the accident. (*Federal Ex. 17 – Sealed* at 35:1–18.)  Accordingly, a disputed issue of facts exists regarding whether Tungsten misrepresented its use of boats before the accident.

### d)   Misrepresenting the Furnace was in full production, not research and development, before the accident.

Federal contends the Policy is void because Tungsten misrepresented that it had entered the full production phase before the loss, and no longer was in the research and development phase. (*Federal P&A* 3:10–11.)  For the reasons stated above regarding the Furnace's pre-accident production level, the Court finds evidence exists supporting this alleged misrepresentation.  However, there is also no dispute that in December 2019, more than a year before Tungsten made its coverage determination, Serov testified that before the accident the Furnace was still in the R&D phase and "[w]e were producing at the very, very slow rate…." (*Federal Ex. 17 – Sealed* at 29:20–30:1.)  Accordingly, the Court finds disputed issues of fact exist regarding this misrepresentation.

### e)   Misrepresenting the Furnace's historical income.

Federal contends the Policy is void because Tungsten misrepresented that the historical income submitted in support of the Claim was based on the sale of tungsten produced by the Furnace and not from the re-sale of tungsten from a Chinese manufacturer. (*Federal P&A* 3:16–18.)  In support of this theory, Federal again relies on Witt's June 12, 2019 letter.  According to Federal,

26

[t]he June 12, 2019 letter misrepresented, among other things, that: a. "For Items #3 and #4 (Production records and support for 720Kgs per day production rate), we provide the following information. [¶] Recent historical Revenue recognition for shipments to Northrup Grumman on #F and #6 Tungsten Shot. . . ." THP/TPW then listed the revenue amounts from October 2017 to March 2018 as evidence of lost income from the damaged furnace.

(*Federal P&A* 4:15–19.)  For the following reasons, the Court finds a disputed issue of fact exists regarding this misrepresentation.

There is sufficient evidence from which a reasonable jury could find Witt's June 12, 2019 letter misleading.  To begin, the letter fails to clarify that the revenue listed was derived from Chinese suppliers and not from tungsten manufactured by the Furnace. Witt's failure to clarify this point is especially misleading given the referenced revenue was provided in response to Federal's requests for (1) "production reports or production history for all products manufactured using the impacted furnace" and (2) "records or calculations" supporting Tungsten's representation in its May 20, 2019 letter that the Furnace had "the capacity to process 700 kilograms of Tungsten Alloy per day running 24/7." (*Federal Ex. 7 - Sealed* at CF01408; *Federal Ex. 10 – Sealed* at CF01072, emphasis added; *Federal Ex. 11 – Sealed* at CF01114.)

Even more troubling is Tungsten's failure to clarify the issue after it received MDD's preliminary report, which incorrectly attributed the October 2017 through March 2018 revenue to the Furnace.  (*See Federal Ex. 12 – Sealed* at CF00949 (in ¶15, attributing "the sintering furnace and its end-product" to the fulfilled purchase order referenced in ¶ 12); *see also Federal Ex. 22 – Sealed* ¶ 21.)  There is no dispute MDD sent the report to Tungsten and was asked: "If you find any of the commentary to be inaccurate, please let us know so that we can update our report…." (*Federal Ex. 13* at CF00584.)  There is no indication Tungsten notified MDD of the error.  For these

27

reasons, Tungsten's request for summary adjudication of this misrepresentation claim is denied.[8]

Nevertheless, there is also evidence raising a disputed issue of fact regarding the intent to deceive.  During Witt's EUO, he clarified that the historical revenue cited in his letter came from tungsten produced in China.  Because Witt clarified the issue more than a year before Federal made its coverage determination, a reasonable jury could find Witt did not intend to deceive Federal.  Thus, Federal's request for summary adjudication is also denied.

### f)    Remaining misrepresentations

Federal also contends the Policy is void because Tungsten misrepresented (1) that it was producing high quality products with little or no scrap or consistency problems before the accident and (2) the impact of the grinding capacity and powder shortages on the post-loss production rates.  (*Federal P&A* 3:12–13,19–20.)  The only mention of these misrepresentations is in the factual statement's list of the eight alleged misrepresentations or concealments.  There is no further discussion throughout the entire brief.  Additionally, as evidence, Federal cites generally to Exhibits 5 through 23, without citing to any "particular parts" of the exhibits.  And while Federal also cites 17 paragraphs in Jaeger's declaration, the only mention of the two misrepresentations is where Jaeger lists all of Tungsten's alleged misrepresentations or concealments.  (*See Jaeger Decl.* ¶ 18.)

Tungsten's opposition points out that aside from listing the two alleged misrepresentations in the factual background, there is no other reference in Federal's

---

[8] Tungsten argues that Federal cannot prevail on this claim because it was informed in October 2017 that the Furnace would not be operational until April 2018 and, in the meantime, it was using tungsten manufactured in China.  The Court disagrees.  As Federal points out, Tungsten's argument misconstrues Federal's claim, which is breach of the Policy, not fraud.  The Policy states that it is void if Tungsten misrepresents a material fact.  It does not require that Federal remain unaware of the fact until after the coverage determination.

28

1    brief.  (*Tungsten Opp'n* 11:4–10.)  Tungsten also points out that Federal fails to

2    adequately identify evidence supporting the misrepresentations.  (*Id.* 16:17–19.)

3    Federal's reply did not respond to Tungsten's argument.  Because Federal has failed to

4    provide evidence of the alleged misrepresentations, the Court denies its motion on these

5    grounds.[9]

6

7        **C.    Tungsten's bad-faith cause of action**

8            To establish a breach of the implied covenant of good faith and fair dealing, an

9    insured must establish that "(1) benefits due under the insurance policy were withheld,

10   and (2) the reason for withholding benefits was unreasonable or without proper cause."

11   Love v. Fire Ins. Exch., 221 Cal.App.3d 1136, 1151 (1990).  "While an erroneous denial

12   of a claim may constitute a breach of contract, it does not by itself support tort liability."

13   LG Infocomm U.S.A., Inc. v. Euler Am. Credit Indem. Co., 419 F.Supp.2d 1248, 1254

14   (S.D. Cal. 2005).  Rather, bad faith exists "[w]hen the insurer unreasonably and in bad

15   faith withholds payment of the claim of its insured."  Frommoethelydo v. Fire Ins. Exch.,

16   42 Cal.3d 208, 214–215, 228 (1986).

17           The genuine-dispute doctrine is an affirmative defense to a bad-faith claim.  Under

18   the doctrine, "an insurer denying or delaying the payment of policy benefits due to the

19   existence of a genuine dispute with its insured as to the existence of coverage liability or

20   the amount of the insured's coverage claim is not liable in bad faith even though it might

21   be liable for breach of contract." Wilson v. 21st Century Ins. Co., 42 Cal.4th 713, 723

22   (2007) (citations omitted).  Guerbara v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir.

23   2001).  The reasonableness of the insurer's decisions and actions must be evaluated

24

25   ────────────────

26   [9] Tungsten's reply argues for summary adjudication of these misrepresentations.  (*See Tungsten Reply*
     [Doc. 62] 3:18–16.)  However, Tungsten did not raise the issue in its brief (*see Tungsten P&A* 6:25–8:2,

27   13:24–20:24), and Federal did not address the issue in its opposition.  Although summary adjudication
     against these two misrepresentations is a close issue, because Federal did not have the opportunity to

28   respond, the Court declines to consider the arguments first raised in Tungsten's reply.

objectively as of the time they were made.  <u>Bosetti v. United States Life Ins. Co. in City of New York</u>, 175 Cal.App.4th 1208, 1239 (2009).  While the issue is generally an issue for the jury, "a court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability." <u>Guerbara v. Allstate Ins. Co.</u>, 237 F.3d 987, 992 (9th Cir. 2001).

Federal seeks summary adjudication of Tungsten's bad-faith cause of action under the genuine-dispute doctrine.  Federal contends that under the circumstances, its denial of coverage was objectively reasonable.  (*Federal P&A* 20:23–24:1.)  Tungsten responds that the genuine-dispute doctrine does not apply because "Federal's investigation was highly flawed and not conducted in good faith."  (*Tungsten Opp'n* 24:15–17.)

As discussed above, the evidence before the Court establishes that Tungsten misrepresented the Furnace's pre-loss production rate.  While Witt's and Serov's subsequent EUO testimony raises questions about whether there was an intent to deceive, Tungsten then appears to have doubled down on the misrepresentation when it submitted the January 2021 revised Claim, asserting that its business income loss nearly doubled based on the representation that the Furnace's pre-accident production was 7600 kg per week.[10]  Again, there is no dispute that Tungsten never achieved even the lower rate of 700 kg per day before the accident.  For this reason, the Court finds a genuine dispute exists regarding whether Tungsten violated the Concealment Or Misrepresentation provision and voided the Policy.

There is also evidence that Tungsten misrepresented that the October 2017 through March 2018 revenue came from tungsten produced with the Furnace.  Aside from the June 12 letter, there is no dispute that (1) MDD's preliminary analysis attributed the

---

[10] This conclusion is made without considering any evidence related to Federal's claim that "[o]n or about July 19, 2019, FIC began receiving communications from current and former employees of THP/TPW claiming that the lost business income claim being submitted to FIC was fraudulent."  (*Federal P&A* 5:21–24, evidentiary citations omitted.)

revenue to the Furnace, (2) MDD sent its preliminary analysis to Tungsten and asked that it identify any inaccuracies, and (3) Tungsten failed to alert MDD to the error in its analysis.  These undisputed facts also support the Court's finding that a genuine dispute exists as to whether Tungsten's conduct voided the Policy.

Tungsten nevertheless argues that summary adjudication is not appropriate because Federal engaged in bad faith by (1) encouraging former employees to breach confidentiality agreements; (2) reviewing stolen documents to assist with its fraud investigation; (3) conducting EUOs in an adversarial manner with the goal of obtaining information to support its fraud claim, rather than to properly adjust Tungsten's claim; (4) failing to comply with its own General Adjuster and Property Special Investigations Unit Guidelines; and (5) putting its own financial interests ahead of its policyholder's. (*Id.* citing "Section II(D)-(E); *see also id.* 24:20–25:6.)  But Tungsten fails to support these allegations with evidence.  Tungsten fails to cite any evidence that Federal encouraged former employees to breach confidentiality agreements,[11] reviewed stolen documents[12], conducted the EUOs in an adversarial manner or put its own financial interests ahead of Tungsten.  The only allegations supported by evidence are Tungsten's contention that Federal did not follow its Best Practices Guideline to "contact the insured by telephone within 2 business days… to make an appointment to obtain their statement"

---

[11] In the factual background, Tungsten alleges "Federal interviewed these former employees despite knowing that they were subject to nondisclosure agreements and that the interviews violated such agreements." (*Tungsten Opp'n* 9:16–18.)  But there is no evidence cited in support of this statement. Tungsten then asserts "the former employees asked Federal to indemnify them in the event Tungsten learned of their breach and pursued legal action." (*Id.* 9:18–20, citing *Federal Ex. 5 – Sealed* at Supp CF 10.25.21 001541.) The evidence cited does not indicate the employees were requesting indemnity for breaching confidentiality agreements.  Instead, in the email, George Pazos requests indemnity "since I was terminated … from and retaliation from Joe Sery and Tungsten…."  There is no mention of nondisclosure agreements.

[12] In the factual background, Tungsten alleges "former employees stole documents from Tungsten and showed them to Federal." (*Tungsten Opp'n* 9:21–22.) Tungsten cites no supporting evidence.  Thus, the assertion that Federal reviewed stolen documents also is not supported by evidence.

and to "give Tungsten the opportunity to address Federal's concerns." (*Tungsten Opp'n* 4:18–5:15.)  This argument is not persuasive for several reasons.

Tungsten has not cited authority for the theory that an insurer's failure to follow its internal guidelines constitutes bad faith.  This is especially true under the facts of this case, where there is evidence that shortly after the Claim was made, Tungsten was misrepresenting the Furnace's pre-loss production.  Moreover, although the investigator from the special investigation unit did not contact the insured within two days of receiving the claim, there is no dispute Federal conducted EUOs of Witt, Serov, and Batache and there was significant correspondence between the parties during the investigation.  Furthermore, the EUO transcripts confirms that Tungsten was well aware that Federal had doubts regarding the representations in the June 12 letter and Tungsten's claims regarding the Furnace's pre-loss production.  For these reasons, the Court finds Tungsten failed to provide authority and evidence supporting its alternative bad faith theories.[13]

Accordingly, summary judgment for Federal is warranted on Tungsten's bad-faith claim.

## V.   CONCLUSION & ORDER

For the reasons set forth above the Court **GRANTS** the motions to seal [Docs. 40, 44, 58, 66, 73], **GRANTS IN PART** and **DENIES IN PART** Federal's motion [Doc. 47] and **GRANTS IN PART** and **DENIES IN PART** Tungsten's motion [Doc. 39].

---

[13] Tungsten's only evidentiary cite is to Exhibit 52, Tungsten's expert report.  (*Tungsten Opp'n*, citing *Tungsten Exhibit 52 – Sealed* [Doc. 57-5] ¶ 24.)  But the cited paragraph relates to Federal's alleged attempt to "gather and build its own information about" allegations that Tungsten's executives were being investigated by the federal government as "additional leverage against Tungsten." (*Exhibit 52 – Sealed* ¶ 24.)  The report, however, is not evidence of Federal's alleged conduct.  It is simply evidence of the expert's opinion regarding an alleged set of facts.  Nowhere in Tungsten's points and authorities, opposition or reply is there a citation to evidence about Federal's attempt to gather information about Tungsten's executives.

- The Court finds that in this case, the period of restoration did not necessarily end when the Furnace reached its pre-loss rate of production and on this basis denies Federal's motion as to Tungsten's counterclaims, and grants Tungsten's request for an interpretation of the period of restoration.

- As set forth more fully above, the Court finds disputed issues of fact exist as to Federal's claims that the Policy is void based on Tungsten's concealments or misrepresentations.

- The Court finds a genuine dispute existed as to whether Tungsten made misrepresentations or concealments that voided the Policy and, on that basis, grants Federal's motion as to Tungsten's bad-faith cause of action.

**IT IS SO ORDERED.**

Dated:  February 7, 2023

Hon. Thomas J. Whelan
United States District Judge